STATE use OYSTER *vs.* ANNAN.—*December*, 1829.

The bond of a Trustee appointed by the Chancellor to sell the real estate of a deceased person, for the payment of his debts, is not liable to be put in suit, after the Trustee has sold the deceased's property, and received the money therefor, upon the order of the Chancellor distributing such proceeds among the creditors, *without* notice to the Trustee of such distribution.

APPEAL from *Frederick* County Court.   This was an action of debt on a Trustee's bond, under a decree of the Court of Chancery, brought by the appellant on the 18th of February, 1820, pleas general and special performance.   The following statement of facts was agreed upon by the parties.   "It is admitted the defendant regularly made and executed the writing obligatory mentioned in the declaration in the following words, to wit:"   Know all men by these presents, that we *Robert L. Annan, William Long, Jacob Winter* and *Philip Nunnamaker*, all of *Frederick* County and *State of Maryland*, are held and firmly bound unto the said *State of Maryland*, in the full and just sum of four thousand pounds current money, to be paid to the said State, to the payment whereof we bind ourselves, our heirs, executors and administrators, jointly and severally, firmly by these presents, sealed with our seals and dated the 28th day of January, 1808.   Whereas by a decree, of the high Court of Chancery passed at December term, 1807, the above named, *Robert L. Annan* and *William Long*, were appointed trustees to sell the real estate of *Solomon Kephart* late of *Frederick* County, deceased, for the payment of his debts, as by the said decree, reference being thereto had will appear; now the condition of the above obligation is such, that if the said *Robert L. Annan* and *William Long*, do and shall well and faithfully perform the trust reposed in them by the said decree, or to be reposed in them by any future order or decree in the premises; then the obligation to be void, &c.

"That before the making the said writing obligatory to wit, on the 28th day of December in the year of our Lord one thousand eight hundred and seven, it was by the honourable the *Chan-*

cellor of the *State of Maryland* on the petition of the creditors of a certain *Solomon Kephart*, deceased, upon a bill filed by them against his heirs at law, adjudged, ordered and decreed, that the real estate of the said *Solomon Kephart*, should be sold to pay his debts. And in the said decree, *Robert L. Annan* the defendant in this cause, and a certain *William Long*, were appointed trustees for the purpose of selling the real estate of the said *Solomon Kephart*, deceased, to raise money to pay his debts, that the said *Robert L. Annan* and *William Long*, accepted the said trust, and executed and made the writing obligatory aforesaid for their trust bond, which was filed in the Chancery Court and approved by the Chancellor, that in the said decree the said *Robert L. Annan* and *William Long*, were directed to proceed to sell the said real estate of the said *Solomon Kephart*, deceased, and were also directed to bring the money arising from the said sale or sales, under the said decree, into the Chancery Court, to be applied under the directions of the Chancellor, or pay it away under the direction of the said Chancellor, after taking out the commission to be allowed the trustees, and the costs of the suit; that the said defendant and the said *William Long*, on the 7th day of March, 1808, made sale of part of the said real estate of the said *Solomon Kephart*, deceased, amounting to $1437, and made a report thereof to the Chancellor. That upon the petition of the creditors of the said *Solomon Kephart*, being again presented to the Chancellor, he did by another order and decree, direct the said *Robert L. Annan* and the said *William Long*, to make a further report of their proceedings, and of the situation of the said real estate of the said *Solomon Kephart*; that the said *Robert L. Annan* and *William Long*, in obedience to the last mentioned order and decree of the Chancery Court, did on the 8th day of April, 1815, after the copy of the said order and petition was served on them, sell the balance of the real estate of the said *Solomon Kephart*, and made report thereof to the Chancery Court, amounting to the sum of $952. That the said *Robert L. Annan* and *William Long*, received the whole purchase money from the purchasers, both at the first and second sale, but never brought any part of

it into the Chancery Court, and never paid any of it away under the direction of the Chancellor. That the Chancellor did regularly order and direct the auditor of the Chancery Court, to state and report an account between the estate of the said *Solomon Kephart* and the said *Robert L. Annan,* and the said *William Long;* that the auditor of the said court in obedience to the said order of the Chancellor, did state an account as aforesaid, and did report the same to the Chancellor, in which account after taking out the commission to the trustees, and their part of all expenses in both sales, and the costs of the Chancery Court, he did distribute the balance to the creditors according to their respective claims, which account, distribution and statement, was afterwards confirmed, and the proceeds of the sales of the said real estate applied according to the statement and distribution made by the said auditor, as appears by exhibit C, made a part of this statement and contained in the following words viz."

Here follows the auditor's report, shewing the claim of *Jacob Oyster,* marked No. 3, to amount to $346 36, his proportion as distributed by the auditor, amounting to $48 88, and the Chancellor's order thereon, confirming the same and directing the proceeds to be applied accordingly, dated January 18th, 1820.

"That the said auditor in distributing the proceeds of the sales of the real estate of the said *Solomon Kephart,* deceased, has given to the plaintiff in this cause as one of the creditors of the said *Solomon Kephart,* as his dividend, the sum of $48 88, as appears in the paper marked C, and the Chancellor by his said order has directed the defendant *Robert L. Annan,* and also the said *William Long,* trustees as aforesaid, to pay to the plaintiff in this action the said sum of $48 88, as aforesaid, with interest in proportion as it has been or may be received. That after all the proceedings aforesaid, the plaintiff in this action brought suit in the name of the *State of Maryland* for his use against the said *Robert L. Annan,* the defendant, on the said bond given by him as one of the said trustees for the faithful performance of his trust, to recover his distributive share of the proceeds of the sale of the real estate of the said *Solomon Kephart,* with interest thereon as aforesaid. It is admitted that

no part of the money due to the plaintiff as aforesaid has been paid by the defendant or any other person. It is admitted that the Chancellor of *Maryland*, at the time he passed said order on exhibit C, had full and competent authority to pass said order, and the same was legally passed by him. If upon this statement of facts the court shall be of opinion that the plaintiff is entitled to recover, judgment is to be entered up for the plaintiff for the penalty of the bond to be released on the payment of the sum of $48 88, with interest in proportion as it has been or may be received, and costs of this suit. If the court shall be of opinion that the plaintiff is not entitled to recover, the judgment of *non pros* is to be entered. Both plaintiff and defendant reserves the right of taking an appeal to the Court of Appeals upon the judgment of the court."

On the above statement, the County Court gave judgment for the defendant, and the plaintiff appealed to this court.

The case was submitted on notes.

*Boyle* and *Pigman* for the appellant. The only point in the cause, is whether the plaintiff was bound to give notice to the defendant, of the Chancellor's order to pay the money, and demand it, before he can maintain his action on the trustees bond?

The case stands upon a statement of facts agreed to by the plaintiff and defendant. This case will settle a very important principle, and rule of practice, as to the right of suing on administration bonds.

The bond will be found in the record, and the courts attention is called to the condition. It is the usual condition for the performance of duties imposed by the original decree, or that may be put upon the trustees by any future order by the Chancellor. The condition does not provide that notice shall be first given of the decree, or order, before action shall be maintained. It was therefore no part of the undertaking or contract, that notice should be given to enable a distributee to maintain his action. The Chancellor's order does not require notice to be given at all—what then makes notice necessary to enable the plaintiff to maintain his suit? There is no law requiring

State use Oyster *vs.* Annan.—1829.

it; you must amplify the law, the contract, and the order of the Chancellor, before you can require any further notice of the cause of action, than was given by the writ of *capias* which originally issued in the case.   The rule as to notice to be given by one party to another before action, is this; where the thing is more in the knowledge of the plaintiff than defendant, plaintiff is bound to give notice, but where each party have the same knowledge, notice is not necessary; for the cases on this point, the court is referred to 1 *Chitty Pleadings*, 320.   Now the dispute in this cause is between trustees, officers appointed by the Chancellor, and one of the distributees.   The Chancellor orders the auditor to state an account current between the trustees, and the estate of *Solomon Kephart*.   This the auditor does, and after taking out costs, &c. distributes the money among the creditors, and reports to the Chancellor, who confirms his report.   The plaintiff sees the sum of $48 88, distributed to him, as one of the creditors, he knows by enquiring, and the defendant might have known the same, by adopting the same means.   It is true that it is usual, when the Chancellor intends to bring an individual into contempt for disobeying his order, to insert a provision to give notice by serving the order.   But the order in this case was to enable the distributees to sue the bond if the money was not paid.   Cases may be found in *England* where notice is necessary to bring the party into contempt for disobedience, as for not bringing money into court, &c.   But our form of trustees bond is peculiar, and the rights of the parties are defined in the condition, and the Act of Assembly under which it is given.

*F. A. Schley* for appellee.

In this case the defendant and *William Long* were appointed by the Chancellor, trustees to sell the real estate of *Solomon Kephart* to pay his debts, and they executed their joint and several bonds with *two* securities, conditioned to perform the trust reposed in them by the decree, or to be reposed in them by any future decree or order in the premises.   The decree directs the trustees to bring the money into court arising from

the sale, " *or to pay it away under the direction of the Chancellor.*" The land was sold in 1815. The creditors being numerous, eighty-two in number, were litigating their claims in Chancery for years, and did not get them adjusted until 1820. On the 18th January, 1820, the auditor made his report, and it was finally ratified, and the trustees ordered to pay over the proceeds of sale accordingly. Of this order the trustees had *no notice,* whatever, they residing twenty miles beyond *Frederick,* and the order passed at *Annapolis* by the procurement of the counsel for the creditors, as soon as the order was passed, the counsel for the creditors to the number of eight or ten, got a copy of the auditor's report, and without informing the trustees of it, or affording them any opportunity to discharge their trust, he immediately issued *four separate* writs, in each case against the two trustees and their two securities, on behalf of each of these eight or ten claimants, making from thirty-five to forty suits, to recover the amount of these claims. The writs were issued on the 20th February, 1820. *No notice* was given to the trustees of the Chancellor's order, and no *demand* made upon them for the money. The service of the *writs* was the *first* notice they had that the plaintiffs were even creditors of *Kephart,* whose estate they had sold. Nor did they know this until they went to the plaintiff's counsel, to see a copy of the audit.

The question is, were the trustees entitled to *notice* from, or a demand by the creditors before they were liable to be sued? Or has the creditor the right, *immediately* on the ratification of the sale to institute a suit on the trustees bond, without any notice or demand, or any opportunity afforded them to pay without being sued?

This question is *res integra* in *Maryland.* The court, and that too of the last resort, are now, for the first time called on to settle the law in this State, as to the liability of trustees appointed by the Chancellor. It is an important question, as its decision will prescribe the duties, and fix the liabilities of a numerous class of *agents,* which the interests of creditors, and the convenience of our courts make necessary.

The sale of lands by trustees in the country, instead of a sale in the Chancery office, by a master in Chancery, is a great convenience and of great advantage to the parties concerned.    Instead of being made in the Chancery office as in *England* and *New-York*, it is made on, or in the immediate neighbourhood of the property, where it is best known, and bidders most likely to attend.    The court should therefore be cautious to establish no rule, which by its oppressive operation would be likely to deter persons from becoming trustees. "It is a rule of law founded on the first principles of natural justice, that no judgment shall be pronounced against one who has *not* had *notice* given of the proceedings, and had an *opportunity* to defend himself." 2 *Stark. Ev.* 977.  "Trustees acting *bona fide* are always treated with liberality and indulgence." 4 *Johns. Ch. Rep.* 628, 629.    Would the court establish a rule under which a trustee could by no ordinary and practicable diligence, and with fair *bona fide* intentions to execute his trust, protect himself from costs and losses which would be ruinous?

If such a rule is established, who would assume the unreasonable and ruinous responsibility of a trustee?    Creditors frequently become restless and querulous, when they can not get their claims adjusted in Chancery, and charge the delay on the trustee, although he has nothing to do with the adjustment of the claims.    It is the duty and the act of the creditors.    The adjustment as to the trustee, is, *res inter alias acta.*    He is no party, and can in no way interfere.  In this state of dissatisfaction all might sue the trustee, *as soon as the order was passed*, and ruin him by costs without affording him the *opportunity* to comply with the order although ready, willing and anxious.    This would be strange indulgence and tenderness to trustees!!    In *England* as in this State, a Court of Chancery enforces its orders, and decrees, by attachment, &c.   The party, however, must first be in contempt, but he cannot be in contempt, until he refuses to perform the order or decree, and he cannot refuse until he is called on to perform.  "And this must always be done by *serving a copy of the order* or decree on him, to give him the *oppor-*

*tunity* to perform." *Wyatt's Prac. Reg.* 298. *Hindes' Prac.* 494. 1 *Harr. Ch.* 443. 2 *Harr. Ch.* 141.

This rule is founded on common sense and common justice. Money paid into court, cannot be withdrawn by the person entitled, unless under an *order* for that purpose, which must be *served* on the accountant general. *Wyatt,* 284. 2 *Harr. Ch. Prac.* 142. In *Maryland,* the money if deposited in bank, could not be drawn out by a creditor or person entitled, except by an application to the Chancellor, who would order a check on the bank, or rather, order the cashier of the bank to pay the money. This order or check, must be *served* or *presented* to the cashier, and is *notice* to the bank.

If ready and willing to pay, he ought to have the *opportunity, afforded* him. Sheer justice demands this, to say nothing about equity. The party or creditor has two remedies ; he may either proceed by way of attachment against the trustee *alone*—or he may sue on the bond and include the securities.

In *either case,* however, the trustee must be *in default.* He must have done that which would amount to a refusal to obey the court's order, to *a contempt* of the court. If a suit is brought, there must be an averment in the pleadings that the trustee *had notice* of the Chancellor's order. See the pleadings in a similar case, in *3d Johnson's Cases,* 53, *The People vs. Bryan.*

In all cases of a similar kind found in the books, *notice* of the order is *averred,* either in the declaration, or replication.

An attorney, who is an officer of the court, cannot be sued for money in his hands as attorney, until *a demand* is made upon him, and he has thus an opportunity afforded him to pay out. 5 *Cowen. Rep.* 376. And in this case he is called *a trustee* by the court. He holds the money in his fiduciary character. Can the trustee be considered as any thing more than an agent of the court? The Court of Chancery have so decided, and have said, that in the sale of lands, he is the mere *agent* of the court, and the contract not binding on the court until they have ratified it. He is then nothing more than the agent to make the sale, and the *agent* to pay away the money. If so, then he is protected by the settled principles of law, that " an *agent* or factor selling

goods consigned to him, cannot be sued, *until* he is ordered *how* he is to pay it, to whom he is to pay it, and has *refused* or neglected.   10 *Johns. Rep.* 285.   See the precedent of a declaration in such cases, 3 *Chitty Plea.* 178, 179.   If goods are consigned to a factor to sell on commission, there must be *a demand* by the principal for the money of those sold, and for the goods unsold.   And an action does not lie against him for not accounting, till *after a demand made* for an account.   1 *Taunt.* 572. The condition of the bond is to perform the trust reposed in them, or to be reposed in them by any future *order* or *decree*— the decree to pay away the money arising from the sale, under the direction of the Chancellor.   How can the trustees know what the *further order* of the court is, or what are their directions until such order or directions are *shewn* to them, and that too by the parties entitled to the benefit of the order, and competent to receive and *release.*   The trustees do not stand in the relation of debtors and creditors.   They are the mere *agents* of the court. The *hands* by which the court for its own convenience, and the convenience, and very great convenience too of creditors, pay away funds under its controul.   As before observed, the adjustment of the creditors claim, is, as to them, "*res inter alias acta.*"   They are not *parties* and can in no way interfere. They cannot even know who are the claimants, until the audit is closed and ratified.

The *argumentum ab inconvenienti*, applies with resistless force; for if the trustees are to be regarded as debtors to the creditors, then they must seek out the creditors.   They must go to every county in the State, or every state in the Union, nay, to *Europe* itself, if the creditors are thus dispersed, to pay them; otherwise to be subjected to suits and costs.   Costs that would be absolute ruin to them.   In this case, we see the ruinous consequences which might be visited upon these trustees, although ready and willing to pay.

There are eighty-two claims.   Each claimant may bring four suits, the bond being several.   This would make the aggregate of three hundred and twenty-eight suits, which at five dollars and fifteen cents to each, would produce an aggregate of costs

equal to *one thousand six hundred and ninety-eight dollars and twenty cents!!* And this too is the *lowest* amount of costs the trustees could escape with, if they were to go to each creditor and pay them as soon as the writs were served. The court will see that the claim of *Jacob Eversall* in only $16 10. *John Sawyer,* $19 12, for which suits were brought, and if the trustees are compelled to pay the costs of these suits, they will amount to more than the principal, that is, the costs in each case will amount to $22 60.

There is one of the claimants, named *John Kennedy*. This claim amounts to nineteen cents, now, can it be possible that the trustees could be compelled to ride over the State to find *Mr. Kennedy* to pay him these nineteen cents, or be liable to be sued with four writs, and made to pay $22 60 costs. Impossible!

The whole net amount of sales is only $2075. Yet, if all the claimants had sued, as soon as the audit was ratified, the trustees might have been compelled according to the plaintiff's idea, to pay nearly the whole of this sum in costs. If the trustees are not entitled to *notice,* to the service of a copy of the audit, or the Chancellor's order, they cannot protect themselves from these ruinous consequences, no, not even though they take their seats at the Chancellor's *elbow,* and wait there for years, to know when the order will be passed; for if they go to pay a creditor in *Baltimore, Finley and Taylor,* for instance, they may be sued while they are in the act of paying there, by the present very vigilant plaintiffs in *Frederick.* No willingness, no diligence, no readiness to pay can save them; it is morally *impossible* for them to protect themselves from ruinous costs, if the creditors are so disposed, and yet, I have always understood it to be a maxim of the law of common sense and common justice, that *lex neminem cogit ad impossibilia.* If it be said that trustees may relieve themselves from these difficulties, these ruinous consequences, by paying the money into court. The answer is, that this would produce such great inconvenience to creditors, that all the benefit arising to creditors and others, from trustees residing near them and near the property sold, would be lost. The creditors, though residing in *Alleghany* or *Worcester,*

would have, each one, to go to *Annapolis* to the Chancellor for a check or order, for the amount of his claim, however small. I cannot believe the court will establish a rule producing such serious inconveniences to suitors and claimants, when a rule obviating every inconvenience to *all* parties, and based upon reason, equity, and sheer justice, is equally in their power. Surely a creditor ought to be satisfied, and can have no right to complain if he is paid his money when he asks for it. Surely a trustee ought to be protected, both by courts of law and courts of equity—for they are both *courts of justice*—when he has acted *bona fide*, when he is ready, willing and anxious to discharge his trust ; when he says, present me the order that I may know what it is, and to whom I am to pay, and I am ready to perform—the money is in my pocket, and has been there for some time waiting for this order. The condition of the bond is, to perform the trust reposed in them. The court, in ascertaining whether they have violated the condition by not performing the trust, will give to their acts a reasonable construction. They will, before they will suffer a suit to be sustained, ascertain and be satisfied that the trustees have been in *default,* and although they do not, being a court of law, proceed by way of attachment, yet, as the Chancellor would not have granted an attachment until the trustees were in *default,* and he would never consider them in default for a disobedience to his order, until they know what that order was, so a court of law will construe the trust, and ascertain the duties and default of the trustees by the same rules of reason and justice, and will not consider the acts of the trustees as a breach of the trust, so as to subject them and their securities to suits on the bond for the penalty, unless on the same evidence, if they were sitting as Chancellors, they would grant an attachment. The court in ascertaining the duties and obligations of parties, are always governed by rules of justice and reason. Thus when a party endorses a note, he does not specify in his contract that he shall have *notice* of the non-payment by the drawer, before he will be bound, yet the courts in fixing his liability, in construing his contract have said, it is reasonable that he should have *notice*, and if the holder does

not give it to him, he is not bound by his endorsement—he is not liable to be sued. So in the case of notes and accounts assigned to another in payment of debts, it has been held by the courts, that the assignee must use due diligence in the collection of them, or the assignor is not answerable on the original, because they say it is reasonable that such diligence should be used for the *protection* of the assignor. And so in many other analagous cases, the court in fixing liability, and ascertaining and determining what shall constitute a breach of duty, and what not, are influenced by the principles of reason and justice. The trustees in this case only ask to have their duties ascertained by these principles, believing as they do, that they will not convict them of a breach of trust in the nonperformance of an order, the existence of which they never knew, and the performance of which they never refused, and the knowledge of which they could not have procured by any ordinary diligence, to save themselves from the clouds of suits with which they are covered, every one of which they would have prevented, if the creditors had only called on them for their money, or given them notice that the audit was made out.

The court are to say what were the *duties* of these trustees, in the *proper* discharge of their trust, what it was reasonable, and right, and equitable to expect of them. They are, by their bond, to perform the *trust* reposed in them. Did this trust require them, *as soon* as the audit was made out, to take it in one hand and the trust fund in the other, and ride through the country, State, or United States, as the creditors might be dispersed, to pay each one his claim? If it did, then they are liable to this suit, and might be sued in one hour after the Chancellor's order, by one hundred creditors, if there were so many, and totally ruined, *uno flatu.* But if, on the contrary, the trustees are entitled to *notice* of the order ; if they are entitled to an *opportunity* to pay, by having the order shewn to them by the person entitled to receive, or his agent or attorney, who may be authorised to give a receipt or release. If they are to be as much favored as the bank, which holds the funds of the Court of Chancery, if they are not to be required to do more than to use

ordinary diligence, to act *bona fide,* and to be ready and willing to pay whenever called on, or whenever the courts order, which they are to obey, is shewn to them by the party entitled to receive and *release.* If, in truth, they are not to be required to perform impossibilities, then they are not liable to the suits which have been brought against them, of which the present is one.

EARLE, J. delivered the opinion of the Court.

This suit was brought by a creditor on the bond of a trustee appointed by the Chancellor, to sell the real estate of a deceased person for the payment of his debts.   The statement agreed on between the parties gives a full account of the proceedings of the trustee in Chancery, from the acceptance of his trust, to the confirmed report of his sale, and the Chancellor's order of distribution of proceeds among the creditors.  The action was instituted within a month after the order, and the complaint is that the plaintiff's proportion of the avails of the sale was sought without giving to the defendant, any previous notice of the final proceedings of the Chancellor.

We have given to this case a further consideration, and after an examination of the authorities, we are inclined to think our first impressions of it were not correct.   The trustee as to the suit is not in the situation of a common debtor, who knows his liability, and whose business it is to look to a compliance with his engagement; nor is his predicament like that of an executor or administrator, who represents the deceased testator, or intestate, in all and each of his contracts, and to whom the creditors individually are to exhibit their claims for settlement.   The creditors are known to the trustee but through the medium of the Court of Chancery, where they file their respective demands to be adjusted by the auditor, and where disputes among them are disposed of by the Chancellor, who finally determines what proportion of the sum of money reported, is to be paid to each of them. ⸱ This proceeding as to the trustee, is *res inter alios acta,* and it is but reasonable that when it terminates he shall be notified of the result, before any steps are taken against him, either by attachment, or by action on his trustees bond, against

him, and his sureties. In the case of an order for distribution and payment, similar to this, to sustain the plaintiff's suit, it appears to us therefore, that he' ought to aver and prove a service of the order on the trustee, and a demand of payment of the sum specified therein; and that without this notice so averred in the proceedings, an action on the trustees bond cannot be maintained. *Vid. 3 Johns. Cases, 53.*

The court mean to confine this decision to an order for distribution and payment by the Chancellor, and with this understanding the judgment of the court below is *affirmed.*

**JUDGMENT AFFIRMED.**